UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| FIRST MERCURY INSURANCE COMPANY, <br> *Plaintiff,* <br><br> *v.* <br> SHAWMUT WOODWORKING & SUPPLY, INC., *et al.,* <br> *Defendants.* | Civil No. 3:12cv1096 (JBA) <br><br> September 23, 2014 |

### RULING ON MOTIONS FOR SUMMARY JUDGMENT

Plaintiff First Mercury Insurance Company ("First Mercury") moves [Doc. # 89] for summary judgment seeking a declaratory judgment that Defendants Shawmut Woodworking & Supply, Inc. ("Shawmut") and Shepard Steel Company ("Shepard"), who are named defendants in state court lawsuits brought by employees of Shepard's subcontractor, Fast Trek Steel, are not "additional insureds" under a general liability policy that First Mercury issued to Fast Trek and thus that there is no duty to defend or indemnify them.

Intervenor-Counterclaim Plaintiff Liberty Mutual Insurance Company ("Liberty Mutual"), who issued a liability policy to Shepard and is providing a defense to Shepard and Shawmut under a reservation of rights opposes First Mercury's motion, and along with Shawmut and Shepard, has cross moved [Doc. # 90, 96-1, 87] for summary judgment seeking a declaratory judgment that First Mercury owes a duty to defend Shawmut and Shepard in the underlying actions. For the reasons that follow, Plaintiff's motion is denied and the motions of Liberty Mutual, Shawmut and Shepard are granted.

I.     **Facts**

   A.     **Background**

On September 13, 2010, a steel web structure collapsed during installation at Yale University's Science Area Chilled Water Plant Shell, causing the death of Robert F. Adrian and injuries to Robert Enfield, Robert Elliot, and Sheneane Ragin, all of whom were iron workers employed by Fast Trek.  Shawmut was the general contractor and designer for the project and subcontracted Shepard for steel fabrication and construction. Shepard in turn subcontracted erection work to Fast Trek.  As required by its contract with Shepard, Fast Trek obtained a general liability policy from First Mercury with a $1 million per occurrence coverage limitation and an excess liability policy from National Union Fire Insurance Company of Pittsburgh, PA ("National Union") with up to $10 million of coverage.[1]

The injured parties and Mr. Adrian's estate administrators have filed negligence suits against Shawmut and Shepard, both of whom have demanded that First Mercury defend and indemnify them as "additional insureds" under its policy issued to Fast Trek. Liberty Mutual is currently providing a defense to Shepard and Shawmut under a reservation of rights and has made demand upon First Mercury to assume that defense, also maintaining that First Mercury has a duty to defend Shawmut and Shepard as additional insureds under the policy issued by First Mercury.

---

[1] National Union has intervened [Doc. # 131] in this action as Counterclaim Defendant opposing Shepard's motion for summary judgment on Shepard's counterclaim against First Mercury.

II.    **Discussion**[2]

    A.    **Insurance Coverage Standards**

At oral argument, all parties agreed that Connecticut law governs, under which "it is well established that a liability insurer has a duty to defend its insured if the pleadings" against the insured "allege a covered occurrence." *Ryan v. Nat'l Union Fire Ins. Co.*, 692 F.3d 162, 167 (2d Cir. 2012) (quoting *Hartford Cas. Ins. Co. v. Litchfield Mut. Fire Ins. Co.,* 274 Conn. 457 (2005) (alterations omitted)).  "In determining whether a claim falls within the scope of an insurance policy, the Supreme Court of Connecticut 'construes broad policy language in favor of imposing a duty to defend on the insurer,' and 'requires a defense if an allegation of the complaint falls even possibly within the coverage.'"  *Id.* (quoting *Hartford Cas. Ins. Co.*, 274 Conn. at 466 (2005) (alterations omitted)).

"[A]n insurer's duty to defend, being much broader in scope and application than its duty to indemnify, is determined by reference to the allegations contained in the [underlying] complaint."  *Coregis Ins. Co. v. American Health Found.*, 241 F.3d 123, 127

---

[2] Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a).  At oral argument, the parties agreed that there were no material facts in dispute as to the issue of First Mercury's duty to defend.  Thus, "summary judgment may be granted as to the extent of coverage as a matter of law."  *Middlesex Ins. Co. v. Mara*, 699 F. Supp. 2d 439, 445 (D. Conn. 2010). There are factual disputes related to the duty to indemnify, however, that cannot be fully developed until after the adjudication of the underlying state court complaints and thus the indemnification claims are not ripe for summary adjudication here.

(2d Cir. 2001) (internal citations and quotation marks omitted) (quoting *Springdale Donuts, Inc. v. Aetna Cas. and Sur. Co.*, 247 Conn. 801, 807 (1999)).

**B.     The Underlying Complaints**

Because coverage is determined as a matter of law by looking at the underlying complaints, *see Ryan*, 692 F.3d at 167, the Court examines the complaints brought by Mr. Enfield and Mr. Adrian's estate, which contain identical allegations against Shawmut and Shepard.  The *Enfield* and *Adrian* complaints allege that the plaintiffs were by "employed by Fast Trek Steel, Inc." and that Charney Architects, LLC ("Charney") created the design for the chilled water plant and designed the steel web structure used to support the building and create the outer shell, including columns and beams to support flat steel trusses upon which tubular steel trusses were to be installed and connected, providing support for the roof decking.  These plaintiffs further allege that "the design created by Charney failed to include critical bolt holes for the steel tubes of the web structure to be secured during construction" and as a result the steel tubes became dislodged and collapsed causing Mr. Enfield to fall from the structure and suffer serious injuries and causing Mr. Adrian's death.  (*See* Complaints, *Robert Enfield v. Charney Architects, LLC, et. al.* ("*Enfield* Complaint") & *Estate of Robert Adrian* v. *Charney Architects, LLC, et. al.* ("*Adrian* Complaint"), Exs. B & C to Liberty Mutual's Loc. R. 56(a)1 Stmt. [Doc. # 91] ¶¶ 1–3, 12–13, 16, 18.)

Shawmut and Shepard are alleged to have "approved this design and accepted the order for fabrication and/or installation."  (*Id.* ¶ 18.)  The specific allegations of

4

negligence as to Shawmut and Shepard are that "through [their] agents[,] servants[,] or employees":[3]

    a.  they approved the web structure in a defective manner making it unsuitable for safe installation;

    b.  they failed to provide for bolt holes in the web structure to allow it to be secured during installation;

    c.  they failed to provide for an alternative means for safe installation;

    d.  they failed to warn . . . of this defect in their design;

    e.  they permitted the . . . workers to utilize steel tubing in the construction of the steel structure that could not be bolted or otherwise safely secured to the underlying steel structure after the initial installation of these tubes, before the steel construction was completed;

    f.  they failed to ensure that the steel tubes could be placed in position on underlying trusses in accordance with applicable government safety regulations;

    g.  they approved and/or allowed the steel and iron workers to install steel tubes that could not be safely fastened to the underlying steel supports while they were being adjusted and construction of the steel support structure was being completed;

    h.  they failed to take reasonable measures to ensure that the work area was safe for the decedent and other workers when they knew or should have known that the steel tubes could not be bolted during installation, adjustments, and completion of the steel support structure;

    i.  they failed to take reasonable measures to ensure that the steel tubes installed by the decedent and other workers could be fastened to the underlying steel truss beams or columns while they were being installed to prevent unsafe movement and/or collapse of the tubes; and/or

---

[3] Claims are also asserted against Nucor Steel Connecticut, who fabricated the steel beams and joists.  (*Enfield* and *Adrian* Compls. ¶ 9.)

      j.   they failed to take reasonable measures to ensure that the work site, work conditions and/or construction methods complied with state and federal safety regulations when they knew or should have known that the steel tubes were not fabricated to be fastened to the underlying steel structure with bolts while the steel structure was being completed.

(*Id.* ¶ 19.)

Mr. Elliot's and Mr. Ragin's identical actions similarly allege that "the defendants, Shawmut and Charney, designed a steel web structure" that negligently failed to include bolt holes on the steel tubes and that Shawmut, Shepard, Charney and other defendants "negligently approved the design flaw and accepted the order for the transaction."  (*See* Complaints, *Robert Elliot, et al. v. Charney Architects, LLC, et al.* ("*Elliot* Complaint") & *Sheneane Ragin, et al. v. Charney Architects, LLC, et al.* (*Ragin* Complaint"), Exs. D–E to Liberty Mutual's 56(a)1 Stmt. Count Three ¶¶ 15–18, Count Two ¶¶ 15–18.)   The negligent acts alleged against Shawmut, Shepard, Charney, and all other defendants[4] are that "through [their] agents, servants and/or employees:"

      a.   They designed the web structure in a defective manner making it unsuitable for safe installation;

      b.   They failed to provide for bolt holes in the web structure to allow it to be secured during installation;

      c.   They relied on tack welding which could not be done due to the adjustable nature of the web structure;

      d.   . . . [T]hey failed to adequately support each piece of steel by at least one bolted connection at each end before it was released from the hoist;

---

[4] Claims are also asserted against Nucor Steel Connecticut, who fabricated the steel beams; Yale University, who owned and maintained the construction site; Epic Metals Corporation, the steel detailer for the beams and joists; and Smedley Crane, who was contracted the hoist the beams.  (*Elliot* and *Ragin* Compls. ¶¶ 7–14.)

    e.  . . . [T]hey allowed heavy structural steel members to sit at the perimeter of the building's roof 30 feet above ground retained by wraps of wire only 18 percent stronger [than] common baling wire;

    f.  They failed to provide for an alternative means of safe installation; and/or

    g.  They failed to warn the workers authorized to be at the site . . . of the defect in their design.

(*Id.*, Counts One–Three ¶ 20.)

Fast Trek is not named in the four underlying complaints and the only specific reference to it is in the *Enfield* and *Adrian* complaints, which each state that the plaintiffs were employed by Fast Trek at the time of the accident. (*Enfield* Compl. ¶ 1; *Adrian* Compl. ¶ 2.)

### C.    Additional Insured Endorsement

The parties' dispute centers around the interpretation of an endorsement in the First Mercury policy issued to Fast Trek that provides for the coverage of "additional insureds" (the "Additional Insured Endorsement"). First Mercury contends (1) that Shawmut is not included in the definition of an additional insured; (2) that even if Shawmut and Shepard qualify as additional insureds, coverage extends only to vicarious liability for the negligence of the named insured, Fast Trek, and because there are no claims asserted against Fast Trek in the underlying actions, there can be no coverage for Shawmut and Shepard; and (3) a policy exclusion for "professional engineering, architectural or surveying services" applies. Although both sides advance plausible arguments in support of their respective positions, guided by the principle that to the extent that "there are two plausible interpretations of insurance policy language, the court will ordinarily select that interpretation that favors the insured over the insurer,"

*Northrop v. Allstate Ins. Co.*, 247 Conn. 242, 251 (1998), the Court concludes that First

Mercury owes Shawmut and Shepard a duty to defend.

The Additional Insured Endorsement in the First Mercury Policy issued to Fast

Trek provides coverage to

> any person or organization for whom you are performing operations when
> you and such person or organization have agreed in writing in a contract
> or agreement that such person or organization be added as an additional
> insured on your policy. Such person or organization is an additional
> insured only with respect to liability for "bodily injury", "property
> damage" or "personal and advertising injury" caused, in whole or in part,
> by
>
> > 1.  Your acts or omissions; or
> >
> > 2.  The acts or omissions of those acting on your behalf; in the
> >     performance of your ongoing operations for the additional
> >     insured.

(Additional Insured Endorsement, Ex. F. to Liberty Mutual's Loc. R. 56(a)1 Stmt. [Doc.

# 90] at 1.)

There is no dispute that Shepard is named as an additional insured under the First

Mercury Policy issued to Fast Trek based on the subcontract between Fast Trek and

Shepard, which provides that Fast Trek was required to "name Shepard as additional

insured."[5]  (Shepard-Fast Trek Subcontract Agreement, Ex. I to Liberty Mutual's 56(a)1

Stmt. § 7.)  However, First Mercury contends that Shawmut is not an additional insured

under the First Mercury Policy because it had no direct contractual relationship with Fast

Trek.  (Pl.'s Mem. Supp. [Doc. # 89] at 21.)  Liberty Mutual and Shawmut do not dispute

the absence of such a direct contractual relationship but maintain that the Additional

_____

[5]  As discussed *infra*, First Mercury nevertheless contends that the underlying
complaints have not triggered coverage for Shepard as an additional insured.

Insured Endorsement does not require privity of contract. (Liberty Mutual's Mem. Supp. [Doc. # 92] at 32; Shawmut's Mem. Supp. [Doc. # 95] at 5–9.) Instead, they contend that when read together, collectively the Shawmut-Shepard subcontract and the Shepard-Fast Trek sub-subcontract satisfy this requirement through a two-step analysis.

First, they rely on Shawmut's contract with Shepard, which required Shepard to obtain insurance that provides:

> Additional Insured Coverage . . . naming Contractor [i.e., Shawmut], Owner, and any other parties required by the Contract Documents as additional insureds on a primary and non-contributory basis to any other insurance carried by the additional insureds . . . .

(Shawmut-Shepard Contract, Ex. H to Liberty Mutual's 56(a)1 Stmt. § 9(E).)

This general contract further required that if Shepard hired additional subcontractors, it "shall require each sub-subcontractor and supplier to be bound by all Contract Documents to the same extent and with the same effect as if the subcontractor or supplier were [Shepard]." (*Id.* § 5(B).)

Second, when Shepard hired Fast Trek as its subcontractor (and Shawmut's sub-subcontractor), their agreement expressly incorporated the Shawmut-Shepard contract as "part of the Subcontractor Documents" (Shepard-Fast Trek Subcontract Agreement, Ex. I to Liberty Mutual's 56(a)1 Stmt. § 2) and separately stated that Fast Trek "shall assume towards Shepard all obligations and responsibilities that Shepard assumes contractually towards [Shawmut], Construction Manager, and/or Owner, and Shepard shall have the benefit of all rights, remedies and redress against [Fast Trek] that [Shawmut] . . . by contract has against Shepard" (*id.* § 8). Additionally and separately, in the Shepard-Fast

Trek contract, Fast Trek was required to "name the Project owner and construction manager as additional insureds." (*Id.* § 7.)

Shawmut and Shepard thus make two arguments.  First, they contend that by its own terms the Additional Insured Endorsement does not require that the "agree[ment] in writing" of Fast Trek and Shawmut to add Shawmut as an additional insured be contained in the same agreement with each other.  Rather they contend that the Additional Insured Endorsement only requires that each of them "have agreed in writing in a contract" for Shawmut to be an additional insured.  They contend that this requirement is fulfilled because Fast Trek explicitly agreed to name Shawmut as an additional insured in its subcontract with Shepard, which required it to name the "construction manager" as an additional insured.  (Shepard-Fast Trek Subcontract Agreement § 7.)  Shawmut also agreed to be named as an additional insured in Fast Trek's policy because its subcontract with Shepard required Shepard to name Shawmut as an additional insured and provided that any subcontractors hired by Shepard, such as Fast Trek, would be bound by the terms of the Shawmut-Shepard contract, including the provision for additional insured.

Second, they contend that because the Shepard-Fast Trek subcontract explicitly incorporated the Shawmut-Shepard subcontract with its additional insured requirement as "part of" the Shepard-Fast Trek agreement (Shepard-Fast Trek Subcontract Agreement § 2), the two agreements essentially merged and thus "Fast Trek and Shawmut *did* agree in the same contract to name Shawmut as additional insured." (Shawmut's Opp'n to Pl. [Doc. # 95] at 9.)

As Shawmut and Liberty Mutual note, nothing in the Additional Insured Endorsement requires that the "agree[ment] in writing" to add an additional insured be contained in a single agreement and they contend that First Mercury seeks to read this term "single agreement" into the Additional Insured Endorsement. Both parties rely on non-Connecticut case law to support their respective positions. For example, in *Pro Con, Inc. v. Interstate Fire & Cas. Co.*, 794 F. Supp. 2d 242, 252 (D. Me. 2011), the court interpreted a provision that is identical to the Additional Insured Endorsement under Fast Trek's policy with First Mercury to "not plainly restrict additional insured status only to those entities that have contracted directly with the named insured" and concluded that it was "immaterial" that the sub-subcontractor agreed with the subcontractor, rather than directly with the general contractor, to add the general contractor as an additional insured.

Likewise in *Millis Dev. & Const., Inc. v. Am. First Lloyd's Ins. Co.*, 809 F. Supp. 2d 616, 621 (S.D. Tex. 2011) contractual privity was not required where, as is the case here, "the actual wording of the Additional Insured Provision does not include the words 'direct' or 'between' in reference to the written contract. Nor are the words 'have agreed' followed by the words 'with each other' or 'together.' To add in those words would require the court to narrow the scope of coverage within the policy, and the court may

not interpret the policy in a way that gives new meaning to the terms of the policy." *Id.* at 626–27.[6]

As Liberty Mutual acknowledges, there is contrary authority interpreting identical language more narrowly to require a direct contractual relationship between the named insured and the entity seeking status as an additional insured. For example in *Westfield Ins. Co. v. FCL Builders, Inc.*, 407 Ill. App. 3d 730, 731 (2011), interpreting identical language to the Additional Insured Endorsement at issue here, the court concluded that the "the plain language of the insurance policy" excluded the general contractor from coverage because

> The policy provision defines an additional insured as "any person or organization for whom you are performing operations when you *and such a person or organization* have agreed in writing in a contract or agreement *that such person or organization* be added as an additional insured." The plain and ordinary meaning of the term "such person or organization" in this provision is that it refers back to the same person or organization for

---

[6] The *Mills Dev. & Const.* and *Pro Con* courts did not view the term "such person or organization" as a limitation requiring privity of contract but rather as a term used to identify the party that would receive additional insured coverage. Thus, under this interpretation as it would apply to this case "such person or organization" would simply refer to Shawmut and that Fast Trek and Shawmut both agreed that the same "person or organization," i.e., Shawmut, would be named as an additional insured to Fast Trek's policy with First Mercury, albeit this was accomplished through separate contracts. *See Pro Con, Inc.*, 794 F. Supp. 2d at 252 ("[T]he . . . repeated use of the phrase 'such person or organization' does not plainly restrict additional insured status only to those entities that have contracted directly with the named insured. For, 'an ordinarily intelligent insured,' without specialized training in law or insurance, would have no reason to read such language as mandating privity of contract."); *Millis Dev. & Const., Inc.*, 809 F. Supp. 2d at 626 ("All that is required is a written contract in which both [the sub-subcontractor primary insurance holder] and [the developer seeking coverage as an additional insured] have agreed that [the developer] would be added as an additional insured on the [sub-subcontractor's] policy.").

whom [the sub-subcontractor] is performing operations, which was mentioned earlier in the same provision, and it does not encompass any other entity. Notably, the provision does not refer to *any* person or organization. By repeatedly using the term "such" instead of "any," the provision necessarily requires that, in order to qualify as an additional insured, an entity must enter into a direct written agreement with [the sub-subcontractor] listing them as an additional insured.

*Id.* at 974 (emphasis in original) (internal citations omitted).

This Court finds more persuasive the reasoning in *Millis Dev. & Const.* and *Pro Con, Inc.* that Fast Trek and Shawmut could agree that Shawmut would be added as an additional insured and both parties' agreement could be memorialized in separate contracts without requiring a direct contractual relationship between the two parties.[7] First, nothing in the text of the Additional Insured Endorsement explicitly requires a direct contractual relationship between Fast Trek and an additional insured. Although the text of the Additional Insured Endorsement requires that Fast Trek and Shawmut

---

[7] Although *Millis Dev. & Const.* and *Pro Con, Inc.* applied Texas and Maine law, respectively, these cases as well as the case at bar applying Connecticut law, are matters of contractual interpretation requiring the respective courts to ascertain the plain meaning of terms in insurance contracts. Any potential differences in state substantive law are not relevant to this inquiry, which requires the application of general principles of contract construction. *See Millis Dev. & Const., Inc.,* 809 F. Supp. 2d at 626 ("When construing insurance policies, the court uses the same rules of construction that apply to construing a contract generally." (applying Texas law)); *Pro Con, Inc.,* 794 F.Supp.2d at 250 n.6; *Am. Prot. Ins. Co. v. Acadia Ins. Co.,* 814 A.2d 989, 993 (Me. 2003) ("A contract of insurance, like any other contract, is to be construed in accordance with the intention of the parties, which is to be ascertained from an examination of the whole instrument."); *Imperial Cas. & Indem. Co. v. State,* 246 Conn. 313, 324 (1998) ("An insurance policy is to be interpreted by the same general rules that govern the construction of any written contract and enforced in accordance with the real intent of the parties as expressed in the language employed in the policy."); *see also* 2 Couch on Ins. § 21:1 ("[I]t is a well-settled point that . . . insurance contracts are construed by the same principles which govern the interpretation of all contracts.").

"have agreed in writing in *a* contract" that Shawmut will be an additional insured, no language requires that both parties agree in the same writing.  Both Fast Trek and Shawmut have "agreed in writing in a contract" for Shawmut to be named as an additional insured.  Shawmut did so in its subcontract with Shepard in which it agreed with Shepard that Shepard would require any sub-subcontractor that it retained, such as Fast Trek, to name Shawmut as an additional insured.  (*See* Shawmut-Shepard Contract § 5(B).)  Likewise, Fast Trek agreed explicitly in its sub-subcontract with Shepard to name the "construction manager," i.e., Shawmut, as an additional insured.  (Shepard-Fast Trek Subcontract Agreement § 7); *see also Pro Con, Inc.*, 794 F. Supp. 2d at 252 ("It is . . . undisputed that [the sub-subcontractor] agreed, in writing [with the subcontractor], that [the sub-subcontractor] would add Plaintiff, the general contractor, as an additional insured.  Under the plain meaning of the [additional insured provision], that is all that is required. That [the sub-subcontractor] entered into this written contract with [the subcontractor], acting on behalf of Plaintiff, rather than Plaintiff itself, is immaterial." (footnoted omitted)).[8]

Second, Plaintiff's interpretation would require the Court to read into the Additional Insured Endorsement terms such as "direct" or "between" in contravention of the rule that courts will not read terms into a contract. *Millis Dev. & Const., Inc.*, 809 F. Supp. 2d at 626–27 ("[T]he actual wording of the Additional Insured Provision does not include the words 'direct' or 'between' in reference to the written contract.  Nor are the

---

[8] Even if Fast Trek and Shawmut were required to agree in a single contract to name Shawmut as an additional insured, because the Shepard-Fast Trek agreement explicitly incorporated the Shawmut-Shepard agreement, arguably Fast Trek and Shawmut did agree in a single merged writing.

words 'have agreed' followed by the words 'with each other' or 'together'. To add in those words would require the court to narrow the scope of coverage within the policy, and the court may not interpret the policy in a way that gives new meaning to the terms of the policy."); *Galgano v. Metro. Prop. & Cas. Ins. Co.*, 267 Conn. 512, 519 (2004) ("If the terms of the policy are clear and unambiguous, then the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning. . . . [C]ourts cannot indulge in a forced construction ignoring provisions or so distorting them as to accord a meaning other than that evidently intended by the parties." (internal quotation marks and alterations omitted)).

At oral argument, First Mercury maintained that its Additional Insured Endorsement should be read to extend up only one-level from Fast Trek to Shepard or else there would be no way for First Mercury to know the extent of liability it was assuming and how to rate its policy. However, if First Mercury wanted to limit its coverage in this way to only those in direct contractual privity with Fast Trek it could have readily done so with explicit contractual language to that effect.[9] First Mercury failed to do so and the Court will not do it for First Mercury by reading such important terms into the policy.

---

[9] Even under this interpretation, First Mercury's exposure for additional insureds is still limited to that caused, in whole or in part, by Fast Trek's acts or omissions.

### D.        Coverage for "Liability"

Next, First Mercury contends that even if Shawmut and Shepard qualify as additional insureds, the coverage only extends

> to liability for "bodily injury," "property damage" or "personal and advertising injury" caused, in whole or in part, by
>
> > 1. [Fast Trek's] acts or omissions; or
> >
> > 2. The acts or omissions of those acting on [Fast Trek's] behalf; in the performance of [Fast Trek's] ongoing operations for the additional insured.

(Additional Insured Endorsement at 1.)

First Mercury and National Union contend that under this limitation, coverage is not available because Fast Trek is not named as a defendant in any of the underlying lawsuits and thus the complaints do not allege injuries caused by the acts or omissions of Fast Trek, only breaches of duties by Shawmut and Shepard.[10]  (Pl.'s Mem. Supp. at 22; Nat'l Union Opp'n [Doc. # 134] at 4.)  Liberty Mutual and Shepard contend that although the determination of coverage is ordinarily governed by the pleadings, the Court can look beyond the pleadings and consider factual evidence that shows that Fast Trek was at least partially a cause of the accident and thus bodily injury was caused at least in part by Fast Trek's acts or omissions as is required for coverage of an additional insured.  (*See* Liberty Mutual's Mem. Supp. at 18; Shepard's Mem. Supp. [Doc. # 87] at 7–11.)  As discussed

---

[10] Liberty Mutual postulates that the reason Fast Trek is not a named defendant is that because under the exclusive remedy rule of the workers compensation law, *see* Conn. Gen. Stat. §31-284, employees are ordinarily precluded from suing their employers.  (*See* Liberty Mutual's Mem. Supp. at 30.)

below the Court concludes that it can consider facts outside the four corners of the state court complaints, which show the possibility that the injuries could have been caused at least in part by the acts or omissions of Fast Trek or those acting on its behalf. Additionally, the Court concludes that even if it constrained itself to considering the four corners of each complaint, there are sufficient facts pled to suggest the possibility of coverage so as to trigger First Mercury's duty to defend.

### 1.   Considerations of Facts Outside the Complaint

The only specific reference to Fast Trek in the underlying complaints is the allegation in the *Adrian* and *Enfield* complaints that the plaintiffs were working for Fast Trek at the time of the accident and that Shawmut and Shepard caused their injuries "through [their] agents[,] servants[,] or employees." (*Enfield* Compl. ¶ 1, Count Two ¶ 19, Three ¶ 19; *Adrian* Compl. ¶ 2, Count Two ¶ 19, Three ¶ 19.) Although Fast Trek is not a party and thus there are no claims asserted against it, Liberty Mutual and Shepard contend that certain investigative documents not incorporated in the pleadings establish that First Mercury is aware that "Fast Trek [was] a cause, if not the only or predominant cause, of the incident resulting in the death and injuries." (Liberty Mutual's Mem. Supp. at 30.) According to them, these documents establish that the accident was caused by Fast Trek's failure to properly secure the steel beams and by Mr. Enfield striking the first beam and setting off a chain reaction that caused three additional beams to fall, none of which would have happened absent the design defects alleged. (*See* Shepard's Mem. Supp. at 6.)

Looking beyond the four corners of a complaint to determine coverage is not precluded under Connecticut law. For example, in *Hartford Cas. Ins. Co. v. Litchfield*

*Mut. Fire Ins. Co.*, 274 Conn. 457 (2005), the president and sole shareholder of a business had his personal dog with him at work when the dog bit and injured a business invitee. The business's insurance company refused to provide coverage under a business liability policy because the underlying complaint did not allege that the dog owner was an employee of the business. *Id.* at 462. Even after the insurance company was provided with information by the dog owner that demonstrated that he was in fact an employee of the covered business, the insurance company continued to refuse to provide a defense. *Id.* at 467. The Connecticut Supreme Court declined to follow the strictures of the four-corners of the complaint rule because "'the sounder approach is to require the insurer to provide a defense when it has actual knowledge of facts establishing a reasonable possibility of coverage." *Id.* at 467 (quoting *Fitzpatrick v. American Honda Motor Co.,* 78 N.Y.2d 61, 67 (1991)); *see also Ryan v. Nat'l Union Fire Ins. Co. of Pittsburgh PA*, 692 F.3d 162, 167 (2d Cir. 2012) (recognizing that rule established in *Hartford Cas. Ins. Co.* under Connecticut law).

The rationale for looking only to the four corners of the complaint is that "the obligation of the insurer to defend does not depend on whether the injured party will successfully maintain a cause of action against the insured." *Middlesex Ins. Co. v. Mara*, 699 F. Supp. 2d 439, 448 (D. Conn. 2010). Thus, because "the duty to defend is broader than the duty to indemnify . . . ., an insurer may be contractually bound to defend even though it may not ultimately be bound to pay, either because its insured is not factually or legally liable or because the occurrence is later proven to be outside the policy's coverage." *Fitzpatrick,* 78 N.Y.2d at 65. "However, to say that the duty to defend is *at least* broad enough to apply to actions in which the complaint alleges a covered occurrence is a far

cry from saying that the complaint allegations are the *sole* criteria for measuring the scope of that duty" and where "the insurer is attempting to shield itself from the responsibility to defend despite its actual knowledge that the lawsuit involves a covered event, wooden application of the 'four corners of the complaint' rule would render the duty to defend narrower than the duty to indemnify—clearly an unacceptable result." *Id.* at 66; *see also Hartford Cas. Ins. Co.*, 274 Conn. at 464 ("An insurer . . . is not excused from its duty to defend merely because the underlying complaint does not specify the connection between the stated cause of action and the policy coverage.").

Following the rationale of *Fitzpatrick* and *Hartford Cas. Ins. Co.*, this Court concludes that it is appropriate to examine the investigative report about the accident as well as the underlying complaints to determine whether there is a duty to defend. Consideration of this material unquestionably suggests the possibility of coverage, because of the evidence that the accident was at least potentially attributable to Fast Trek's failure to properly secure the beams and Mr. Enfield striking the beams.[11]

---

[11] The duty to defend is determined on the basis of whether "[t]he complaint . . . creates at least the *possibility* that the underlying action . . . falls within" with the policy language, *Hartford Cas. Ins. Co. v. Litchfield Mut. Fire Ins. Co.*, 274 Conn. 457, 466 (2005) (emphasis in original), and resolution of disputed facts regarding fault and causation of the underlying accident are left to the state court trials.  This Court's determination is simply whether the facts known to First Mercury suggest at least the *possibility* that Shawmut and Shepard will ultimately be entitled to coverage such that the duty to defend is triggered.  *See id.*; *see also Pro Con, Inc.*, 794 F. Supp. 2d at 257 ("[T]here . . . is certainly the potential that facts might be developed at trial [in the underlying action] that would result in the fact finder determining that [the employee's] bodily injuries were caused, at least in part by, the acts or omissions of [his employer who was not a party to the underlying action] (or its agents) in the performance of these operations.").

The investigation by the Occupational Safety and Health Administration (OSHA) provided the following summary of the incident:

> On 9/13/10, employees explained that the upper safety cables were being pulled into place.  The General Foreman, Fast Trek Steel had directed two employees to tighten safety cable on the steel.  The General Foreman, Fast Trek Steel was on the tube steel, and at ground level, a Foreman were plumbing the steel.  At the northwest area of the structure, to plumb the tube steel, the General Foreman, Fast Trek Steel had used a mallet to hammer the tube steel to align it.  On the ground, a ground Foreman used a laser set on the foundation, and told the General Foreman, Fast Trek Steel when the tube steel had been aligned.  Two Ironworkers, one who was an Apprentice were in an aerial lift to tighten the upper safety cable attached to this steel.  One piece of tube steel had been aligned and then the General Foreman, Fast Trek Steel then moved onto a shorter tube steel at the northwest end.  Apparently, using the mallet he struck this piece once or twice and the tube steel fell off the structure, the General Foreman, then fell to the ground.  A second piece of tube (adjacent to the shorter piece) then fell to the ground, a third piece of tube steel fell and landed on the Foreman who had been standing below the work for alignment.  Then a fourth piece of tube steel fell on an Apprentice Worker #2 and another Ironworker who [was] in the aerial lift.

(OSHA Report, Ex. K to Liberty Mutual's 56(a)1 Stmt. at K35.)

The OSHA report also describes statements of Mr. Enfield,[12] Fast Trek Steel's General Foreman, about his decision to use wire to secure the steel.  An apprentice ironworker asked if using wires to secure the tubes was typical or the best way, Mr. Enfield replied, "Yep, just do it." (*Id.* at K36.)  After the ironworker foreman discovered that the tubes did not have holes to connect them, he suggested to Mr. Enfield that they use an angle iron to weld it or use clamps to secure it.  Mr. Enfield responded, "No, takes

---

[12] Mr. Enfield is also named as a Defendant in this action in which First Mercury seeks a declaration that it is not responsible to pay Mr. Enfield any damages that may be owed to him by Shawmut or Shepard. (*See* Third Am. Compl. ¶¶ 65–66.)

too much time." (*Id.* at K37.)  After the first tube was connected with wire, the same ironworker asked Mr. Enfield about OSHA regulations requiring tubes to be properly secured and was told "If I didn't like it, I could look for another job." (*Id.* at K37–38.) This material surely "creates at least the *possibility* that the underlying action" falls within the coverage of the Additional Insured Endorsement. *Hartford Cas. Ins. Co.*, 274 Conn. at 466.

> 2.     *Four Corners of the Complaint*

Further, as Shawmut notes, allegations of the underlying complaints alone suggest that the injuries were caused at least in part by Fast Trek. (*See* Shawmut Opp'n at 10–11.) The *Adrian* and *Enfield* complaints allege the plaintiffs were working for Fast Trek at the time of the accidents and that Shawmut and Shepard caused their injuries "through [their] agents[,] servants[,] or employees," which could include Fast Trek as a subcontractor of Shepard. (*Enfield* Compl. ¶ 1, Count Two ¶ 19, Three ¶ 19; *Adrian* Compl. ¶ 2, Count Two ¶ 19, Three ¶ 19.)  The *Elliot* and *Ragin* complaints likewise allege that Shawmut and Shepard acted negligently "through [their] agents, servants and/or employees" (*Elliot* Compl. Count Two ¶ 20, Count Three ¶ 20; *Ragin* Compl. Count Two ¶ 20, Count Three ¶ 20), without mention of Fast Trek.

In *ProCon*, interpreting an identical additional insured provision, the court held that where an employee of a sub-subcontractor alleged injuries arising from his work at a construction site but did not assert a claim directly against his employer in the underlying action, the general contractor was nevertheless entitled to a defense under the additional insured provision of the employer's insurance policy because the allegations of the underlying complaint "establish that the injury arose out of [the sub-subcontractor's]

operations performed for [the general contractor].  From these allegations, there also is certainly the potential that facts might be developed at trial that would result in the fact finder determining that [the employee's] bodily injuries were caused, at least in part by, the acts or omissions of [his employer] (or its agents) in the performance of these operations."[13]  794 F. Supp. 2d at 257.

Similarly, in *Ramara, Inc. v. Westfield Ins. Co.*, 298 F.R.D. 219, 223–25 (E.D. Pa. 2014), an employee of a construction subcontractor was injured at a job site and asserted claims against the general contractor but not his employer, who he was barred from suing under the state's worker compensation scheme.  Interpreting an additional insured provision identical to Fast Trek's provision with First Mercury, the court held that the general contractor was entitled to a defense under the subcontractor's additional insured provision, because the employee alleged in his underlying complaint that the general contractor was "acting by and through [its] agents, servants and/or employees" and that he was employed by a subcontractor retained by the general contractor.  *Id.* at 226.  Thus, the court concluded that "a consideration of the four corners of the complaint and the

---

[13] As in Connecticut, "[u]nder Maine law, an insurer's duty to defend is decided by comparing the allegations in the underlying complaint with the provisions of the insurance policy to determine whether the complaint shows a possibility that the liability claim falls within the insurance coverage."  *Pro Con, Inc.*, 794 F. Supp. 2d at 250 (internal quotation marks omitted)).

four corners of the Policy allows us to infer that it is *possible* that a jury could find that [the employer's] conduct was . . . a cause . . . of [the employee's] injury."[14]  *Id.*

Accordingly, the allegations of the underlying state court complaints suggest the possibility of coverage.

### 3. *Vicarious Liability*

Next, First Mercury and National Union contend that regardless of whether "Fast Trek was at all partially or entirely responsible for causing the underlying plaintiffs' injuries is not relevant."  (Pl.'s Opp'n to Liberty Mutual [Doc. # 120] at 5, 8.)  Instead they contend that the "common purpose of an additional-insured provision is to provide . . . protection from vicarious liability[15] and to provide specialized protection rather than all-encompassing coverage."  (Nat'l Union's Opp'n at 5 (quoting *Ne. Utilities Serv. Co. v. St. Paul Fire & Marine Ins. Co.*, No. 3:08-CV-01673 (CSH), 2012 WL 2872810, at *9 (D.

---

[14] Also like Connecticut, "[t]he duty to defend in Pennsylvania arises when 'a claim against the insured is *potentially* covered by the insurance policy.'"  *Ramara, Inc.*, 298 F.R.D. at 223 (quoting *Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.*, 606 Pa. 584 (2010) (emphasis in original)).

[15] The concept of vicarious liability is a "a legal fiction" in which liability is imposed "'based on a relationship between the parties, irrespective of participation, either by act or omission, of the one vicariously liable, under which it has been determined as a matter of policy that one person should be liable for the act of the other.  Its true basis is largely one of public or social policy under which it has been determined that, irrespective of fault, a party should be held to respond for the acts of another."  *DelSanto v. Hyundai Motor Fin. Co.*, 882 A.2d 561, 564–65 & n.10 (R.I. 2005) (quoting *Nadeau v. Melin*, 260 Minn. 369, 375–76 (1961)).

Conn. July 12, 2012) (internal quotation marks omitted)).[16]   They focus on the word "liability" in the Additional Insured Endorsement, providing that an additional insured's coverage is "only with respect to *liability* for '. . . injury' caused, in whole or in part, by" Fast Trek's acts or omissions (Additional Insured Endorsement at 1 (emphasis added)), which they interpret as indicating coverage only for instances where vicarious liability is imputed to an additional insured as a result of acts or omissions of Fast Trek, apart from their own independent acts or omissions.   (Pl.'s Opp'n to Liberty Mutual at 6; Nat'l Union's Opp'n at 5.)

The "intent of the parties" is determined "as expressed in the language employed in the policy," *Imperial Cas. & Indem. Co. v. State*, 246 Conn. 313, 324 (1998), and First Mercury's policy lacks language to connote the limitation it now urges.   If "the parties had intended coverage to be limited to vicarious liability, language clearly embodying that intention was available."   *McIntosh v. Scottsdale Ins. Co.*, 992 F.2d 251, 255 (10th Cir. 1993) (internal quotation marks and alterations omitted)); *see also, e.g., Ne. Utilities Serv. Co.,* 2012 WL 2872810, at *4 (holding that an additional insured that provided coverage

---

[16]   Additionally, National Union's interpretation of the purpose of an additional insured provision is not one that is universally accepted in the industry.   One commentator has explained that additional insured provisions are included in construction insurance subcontracts so that the "allocation of risk . . . goes downstream with the effect that the party performing the work or supplying the materials bears responsibility for the risks and losses associated with the work it performs or the materials it supplies."   *See* Scott M. Seaman & Jason R. Schulze, *Assignment of risk in the construction contracts, in* ALLOCATION OF LOSSES IN COMPLEX INSURANCE COVERAGE CLAIMS § 16:2 (Nov. 2013).   Under this view, coverage for Shawmut and Shepard would be consistent with the purpose of an additional insured endorsement to provide them with protection from liability upstream and to appropriately allocate risk to Fast Trek for its own work that resulted in the claimed injuries.

"[t]o the extent that such additional insured is *held liable* for your acts or omissions arising out of and in the course of ongoing operations performed by you or your subcontractors for such additional insured" covered vicarious liability only (emphasis added)); *Harbor Ins. Co. v. Lewis*, 562 F. Supp. 800, 804–05 (E.D. Pa. 1983) (additional insured coverage "only to the extent of liability resulting from occurrences arising out of *negligence* of" the policyholder "was to cover the additional insureds for vicarious liability alone." (emphasis added)).

Another flaw in the argument of First Mercury and National Union is that they fail to give effect to the full phrase "liability . . . caused, in whole or in part" by the named insured (Additional Insured Endorsement at 1), specifically the "in whole or in part" language. *See Finkel v. St. Paul Fire & Marine Ins. Co.*, No. 3:00CV1194 (AHN), 2002 WL 1359672, at *3 (D. Conn. June 6, 2002) ("Since it must be assumed that each word contained in an insurance policy is intended to serve a purpose, every term will be given effect if that can be done by any reasonable construction." (internal quotation marks omitted)).   The inclusion of this language is inconsistent with "liability" meaning "vicarious liability," because vicarious liability is an all or nothing proposition and thus a party could not be vicariously liable "in part" for Fast Trek's acts.   Interpreting identical language, the court in *Pro Con*, explained that the insurer, "by including the language 'in whole or in part' in [the additional insured provision], specifically intended coverage for additional insureds to extend to occurrences attributable in part to acts or omissions by both the named insured *and* the additional insured."   794 F. Supp. 2d at 256–57 (emphasis in original).

Finally, the history of the standardized contractual language developed by the Insurance Services Office ("ISO") and used in the First Mercury Additional Insured Endorsement confirms that the word "liability" relates to proximate causation and not vicarious liability.[17]   An earlier version of the ISO's additional insured endorsement provided for coverage "only with respect to liability *arising out* of 'your work' for that insured by or for you."  *Merchants Ins. Co. of New Hampshire v. U.S. Fid. & Guar. Co.*, 143 F.3d 5, 9 (1st Cir. 1998) (emphasis added).  Courts had interpreted this broad "arising out of" language to "provide[] coverage not only for claims 'arising out of' the named insured's negligence, but also [to] include coverage for the additional insured's sole negligence because the language of the endorsement only requires a substantial nexus (as opposed to proximate causation) between the injury and the named insured's work to trigger additional insured coverage."  *See* Seaman, ALLOCATION OF LOSSES IN COMPLEX INSURANCE COVERAGE CLAIMS § 16:2.

For example, in *Royal Indem. Co. v. Terra Firma, Inc.*, 50 Conn. Supp. 563, 573–74 (Super. Ct. 2006), the Superior Court held that an additional insured provision in a policy with the "arising out of" language provided coverage for the independent negligence of the general contractor, a breach of the non-delegable duty to maintain a safe

---

[17] The "Insurance Services Office, Inc. (ISO), an association of approximately 1,400 domestic property and casualty insurers . . .  is the almost exclusive source of support services in this country for [commercial general liability ("CGL")] insurance.  ISO develops standard policy forms . . .; most CGL insurance written in the United States is written on these forms."  *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 772 (1993).  The First Mercury Additional Insured Endorsement identifies it as being the ISO's 2004 version.  (*See* Additional Insured Endorsement at 1.)

worksite, resulting in injuries to the subcontractor's employees,[18] because the injuries were causally related to the subcontractor's work in that the trench that collapsed was the work of the subcontractor. *See id.* at 573–74 ("The injuries of [the employees] clearly occurred in the performance of [their employer's] work. [The general contractor's] liability arose not by virtue of its broad role as general contractor for the entire project, but rather in its far more narrow role as general contractor for [the subcontractor's] work. In that sense, [the general contractor's] liability 'arose out of' the 'work' of [the subcontractor].").

In the 2004 version of the ISO's additional insured endorsement, used by First Mercury here, the ISO amended this language to require that liability be "caused in whole or in part" by the named insured rather than simply "arising out of" the named insured's acts or omissions, as stated in the 1986 version, in order to eliminate coverage for the additional insured's sole negligence, such as was the case in *Royal Indem. Co.* The word "liability" appeared in both versions of the ISO forms and the progression from "arising out of" to "caused, in whole or in part, by" shows that that "liability" refers in both instances to causation and the amendment was intended to require proximate causation

_____

[18] As is the case here, the insured could not be sued directly due to the worker's compensation laws and thus the additional insureds could not be held vicariously liable for the insured's conduct. *Royal Indem. Co.*, 50 Conn. Supp. at 565, 570.

by the insured rather than simply but-for causation.[19]   *See Stewart v. Federated Dep't Stores, Inc.*, 234 Conn. 597, 605–06 (1995) ("Philosophically, cause in fact is limitless; 'but for' the creation of this world, no crime or injury would ever have occurred. . . . Therefore, as a practical matter, limits must be established.  Lines must be drawn determining how far down the causal continuum individuals will be held liable for the consequences of their actions.  This line is termed 'proximate cause.'" (citing W. Prosser & W. Keeton, Torts (5th ed. 1984) § 41)).

Thus, that Shawmut's and Shepard's "liability" must be "caused, in whole or in part" by Fast Trek's acts or omissions means that coverage under the Additional Insured Endorsement is not limited to Shawmut's and Shepard's vicarious liability for Fast Trek's acts or omissions but instead refers more broadly to liability that is caused, at least in part, by Fast Trek, but excludes situations involving only the independent acts of negligence of the additional insureds.

### E.   Professional Services Exclusion

Finally, First Mercury contends that even if Shawmut and Shepard are covered as additional insureds, coverage is precluded by a policy exclusion in the Additional Insured Endorsement, providing that additional insureds are not covered for:

---

[19] In *Royal Indem. Co.*, the Superior Court interpreted "liability" in this manner and the Connecticut Supreme Court affirmed and adopted this opinion as its own.  *See* 287 Conn. 183, 189 (2008) ("Because the trial court's memorandum of decision fully addresses the arguments raised in the present appeal, we adopt the trial court's concise and well reasoned decision as a statement of the facts and the applicable law on these issues.").

1. "Bodily injury" . . . arising out of the rendering of, or failure to render, any professional engineering, architectural or surveying services, including:

   a. The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, or drawings and specifications; and

   b. Supervisory, inspection, architectural or engineering activities.

(Additional Insured Endorsement at 1.)[20]

First Mercury contends that this policy exclusion applies to Shepard because "the crux" of the underlying claims is "negligence in approving designs, specifications and orders relating to the design for the web structure."[21]  (Pl.'s Mem. Supp. at 27.)  When an insurer, such as Plaintiff, relies on a policy exclusion to deny coverage, it has the burden to show that the allegations of the underlying complaint are "entirely within the policy exclusions" and "subject to no other interpretation," *VT Mut. Ins. Co. v. Ciccone*, 900 F. Supp. 2d 249, 273 (D. Conn. 2012), and the "crux" of the allegations is insufficient.

Shawmut, identified in the underlying complaints as "the general contractor," and Shepard as the "subcontractor for steel fabrication," are not designated as professional

---

[20] First Mercury also relies upon a broader professional liability exclusion in the First Mercury-Fast Trek policy not found in the Additional Insured Endorsement (*see* First Mercury Policy, CO 22 79 01 96, at F49), but, as Liberty Mutual notes, this exclusion explicitly only applies to injury "arising out of the rendering of or failure to render any professional services by you or on your behalf" where "you" would refer to the insured, Fast Trek.  Because the underlying complaints do not suggest that Fast Trek was providing or obtaining professional services, this exclusion is not applicable, much less as to Shawmut and Shepard.  First Mercury does not respond to Liberty Mutual's argument on this point.

[21] National Union does not rely upon this policy exclusion in arguing that coverage should be denied.

architects, engineers, or surveyors.  While the underlying complaints, which also name Charney Architects, do allege negligent design and approval of the design of the steel tubes, they also contain general allegations of failure to warn, failure to ensure a safe work area, and failure to properly install the steel beams.  Thus, the professional liability policy exclusion does not apply to all of the allegations of the underlying complaints and does not absolve Plaintiff of its duty to defend Shawmut and Shepard.  *See Zurich Am. Ins. v. Liberty Mut. Ins.*, X07CV030084312S, 2004 WL 1789015, at *5 (Conn. Super. Ct. July 16, 2004) ("The underlying complaints contain allegations that Alstom negligently supervised the planning, work, efforts, and performance of BVCI so as to provide a safe workplace.  On their face, these allegations are not limited to supervisory functions with respect to architectural or engineering compliance.  They are broad enough to embrace claims of general project supervision and safety in the workplace.").

## III.    Conclusion

For the reasons set forth above, First Mercury's Motion [Doc. # 89] for Summary Judgment is DENIED.  The Motions of Liberty Mutual, Shawmut and Shepard [Doc. # 90, 96-1, 87] for Summary Judgment are GRANTED as to First Mercury's duty to defend.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 23rd day of September, 2014.

30